## MUNICIPAL COURT.

### BOSTON, MARCH, 1824.

*The Commonwealth*
v.     }   LIBEL.
*Joseph T. Buckingham,*

Truth, when may be given in evidence or in justification or to rebut the presumption of malice, on indictment for libel.

Present—Hon. *Peter O. Thatcher.*

*James F. Austin,* Esq. counsel for the commonwealth.

Hon. *Benjamin Gorham* and *S. L. Knapp,* Esqrs. counsel for the defendant.

The defendant was charged in an indictment for a libel found by the grand jury, for publishing in the New-England Galaxy of November 7th, 1823, the following article:

" RECORD OF FASHION.  The pupils of Messrs. Parks and Labasse gave a splendid exhibition of dancing at Concert Hall on Tuesday evening.  The elegance of attitude and the gracefulness and ease of their movements afforded a proof of the science, skill, and taste of their instructors, and elicited the approbation of a crowded and fashionable concourse of spectators.

" A communication respecting this exhibition and ball has been received, the chief object of which is to give the details of an unpleasant and disgraceful disturbance which occurred in the course of the evening.  The *history* would not do much honour to the parties concerned, and we decline its publication at present, though it is but just to the character of Mr. Parks, to say that we have not heard that any blame was attached to *his* conduct on the occasion, but that, on the contrary, he kept as much aloof as possible' from the scene of anger and confusion.

" The rugged Russian bear, it is said, was a conspicuous actor in the *farce*, which had well nigh turned out to be a *tragi-comedy*, in consequence of his attempting to jump, with his cocked hat and all, down the throat of one of his opponents.  We think, with our correspondent, that it is best, at the present moment, to give no opinion on the *merits of the controversy*, but leave it to the decision and final adjudication of him, who, while acting as the representative of the greatest monarch in the world— the magnanimous Alexander, the autocrat of all the Russias, the honorary member of the Massachusetts Peace Society, the grand pacificator of Europe—does not deem it a derogation from the dignity of his high vocation, to

become a party in the quarrels of dancing masters and fiddlers."

The indictment consisted of two counts, in both of which the whole article was recited, with inuendoes and averments in the usual form. The first count alleged that the defendant, in the publication complained of, in- tended maliciously to defame, vilify and scandalize Alexis Eustaphieve, and hold him up to the contempt and ridi- cule of the public. The second alleged, that the defend- ant maliciously libelled the said Alexis Eustaphieve, with intent to destroy his reputation, and thereby deprive him of the emoluments of his office, as consul of the emperor of all the Russias.

*James T. Austin,* Esq. in opening the case to the jury, remarked, that the indictment was founded on a certain piece, published in the New-England Galaxy, which formed the basis of a third count in an indictment found by the grand jury at a former term of the court, but which was found to contain an informality, which excluded it from trial. It had passed again through the hands of the grand jury, and he trusted there was no fatal deficiency of technical formality. It had no connection now, how- ever, with the other counts in that indictment, and was to be tried without any reference to any of the publica- tions that were the subject of the former trial. There were three points for the jury to consider. First, wheth- er the defendant published the piece as set forth in the indictment. Secondly, whether Alexis Eustaphieve, the Russian consul, was the person to whom the piece was intended to apply. And *thirdly,* whether the piece was *in itself* libellous. On the first point, it was not neces- sary to exercise the patience of the court and jury, for

defendant admitted that he published the paper containing the article complained of.

As to the second and third questions for the consideration of the jury, Mr. Austin remarked, that it could not be doubted that the piece was libellous, and explained to them very briefly the nature of libels, and why they were considered as breaches of the peace. If the jury should find that the piece which had been read to them was a libel, and that the Russian consul was the person alluded to, as was averred in the indictment, the defendant must be pronounced guilty.

Johnson S. Ellery, who, being sworn, testified, that Alexis Eustaph'eve was the accredited consul of the Russian emperor, residing in Massachusetts; that he had been so for fourteen years; that he (Eustaphieve) was at the ball at Concert-Hall on the Tuesday evening preceding the 7th of November, and behaved with the utmost propriety; that there was no other person at the ball, to whom the remarks could apply. He admitted that the consul endeavored to act as a mediator; some of the persons with whom the disturbance originated being foreigners, and unacquainted with our language, they called upon him (the consul) to translate and explain, and he entered into the quarrel no farther than the business of translation or explanation rendered proper and necessary. He farther stated, that the defendant, in a conversation with him (Ellery) on the 13th of January last, acknowledged that the consul was the person for whom the application was intended. On being questioned by defendant's counsel, Mr. Ellery would not testify to the precise words used by defendant, but was positive that the personal application was admitted. He stated that he called on the defendant at defendant's office, on the

BOSTON,    day aforesaid, intending to act as a peace-maker, and en-
March, 1824.
           deavour, if possible, to effect a reconciliation of all dif-
Com'wealth ferences between the consul and defendant; that Mr.
    v.     Coolidge went with him, at his request, to defendant's
Buckingham.
           office; that he told the defendant, that the consul was
           desirous of stopping all farther proceedings, and that he
           thought defendant ought to meet these pacific overtures
           with a correspondent disposition, and manifest his good
           feelings by publishing some kind of an apology to soothe
           the wounded feelings of the consul; that he had written
           an apology, which he showed defendant, and thought he
           ought to publish it.

The defendant produced a paper, of which the follow-
ing is a copy, which Mr. Ellery admitted to be that which
he presented for publication.

"In justice to ourselves we cannot but express our sincere re-
gret that any thing should have appeared in the Galaxy to
wound the feelings, or reflect on the character of Mr. Eusta-
phieve, a gentleman for whom we have the highest respect, and
whose conduct, both private and public, we believe to be irre-
proachable. Inadvertency, absence from home, and the abuse of
our confidence by correspondents, with whose motives we were
not acquainted, must be our apology. We wish to be under-
stood as including within the above explanation the article da-
ted November 7, 1823, charging the consul with undignified de-
portment at the ball at Concert-Hall, as, on subsequent informa-
tion (not having been present ourselves) we *are assured* the
statement is altogether unfounded."

Mr. Ellery then stated that defendant declined pub-
lishing this apology, but said he would publish something
similar in substance, but in language of his own; and that
he accordingly wrote a few lines, and expressed a willing-
ness to publish them, but which he (Ellery) thought would
not be sufficient, but would make the matter worse, and
be adding insult to injury. He stated that, as nearly as

he could recollect the substance of what defendant wrote, it was, that as there were contradictory accounts of the transactions at Concert Hall, on the evening of the exhibition, some gentlemen declaring that there was nothing improper in the conduct of the consul, and others, of equal respectability and veracity, maintaining the contrary, it was not for him, (defendant) to decide, or to reconcile the contradiction.

BOSTON,
March, 1824,

Com'wealth
v.
Buckingham.

*Question by defendant.* Did I not assign to you as a reason for refusing to publish the piece you presented, that, if published, it would amount to a declaration of my disbelief in the representations of men of veracity, or that, in other words, it would be charging them directly with falsehood?

The witness admitted that was the reason given for the refusal.

*S. L. Knapp,* Esq. opened the defence, in which it was contended that the piece was not, in its nature, libellous; and that, if it were so, it was not a libel on the consul. The quotation, "the rugged Russian bear," was no more a disignation of him, than it was of any other Russian; that it was no more libellous to make use of it in the manner in which defendant used it, then the terms Yankee, John Bull, or Nic Frog, when applied to one of our own citizens, and Englishman, or a Frenchman. He contended that the Russian consul should not be identified with the description in the paper. The piece spoke of the representative of the autocrat of all the Russias. Mr. Eustaphieve was not such a representative. He was a consul, a mere commercial agent. If the description answered to that of any person, it was the Russian minister, Baron *Tieul,* and it was he, if any one, that was libelled. But there was no libel. The piece did not

BOSTON, March, 1824.

Com'wealth v. Buckingham.

describe Mr. Eustaphieve, and the person whom it did describe, in part, was not present. The piece could not be considered a libel. It was an account of an occurrence which took place at a public ball, given at a well-known licensed tavern. An exhibition of dancing had been proposed; the attention of the public had been invited to it by advertisements in the newspapers; tickets were sold to admit the bearer; and the exhibition was as fair a subject of remark and criticism as the entertainments at the theatre. An unpleasant and disgraceful disturbance or quarrel took place at this exhibition; and if it were libellous to give the particulars of the quarrel, and to comment thereon, he saw no reason why it was not libellous to publish an account of a riot in the street. If this were a libel, hundreds of libels were published every week, and no editor of a newspaper could escape from a prosecution. He urged that this piece wanted the principal ingredient to constitute a libel: There was no malice in it. Mr. Ellery, the witness for the prosecution, had stated on the stand, that the defendant had disclaimed all malice and personal animosity, and had declared his willingness to publish any thing that he could in honour publish, to soothe the lacerated feelings of the consul. He did not, it is true, publish the apology presented to him by Mr. Ellery. He did right in refusing to publish it. Had he done so, he would have met, and justly met, the contempt of the public. I, said Mr. K. should have despised him, and so would every man of high-minded and honourable feeling. He acted as every prudent and honest man would act, and did not meanly endeavour to get out of a small difficulty, by getting into a worse one. The facts which he stated in the paper were communicated to him by men of respectability and

BOSTON,
March, 1824.

Com'wealth
v.
Buckingham.

veracity, and he did not choose, for the sake of conciliation, however much he might desire it, to say that he disbelieved such men. He acted wisely and properly, in refusing to decide which of the parties was guilty of falsehood. Mr. Knapp said he expected to be able to prove that the Russian consul took an active part in the disturbance at the exhibition, and that, if he interfered merely as a translator, he did it with so much earnestness and zeal, as led the spectators generally to disbelieve that he felt a strong interest in the success of one of the parties. He concluded by remarking, that it was necessary for the defendant to show that the occurrences took place, substantially, as he had stated in the paper, in order to rebut the charge of malice ; and for that purpose he should call sundry witnesses.

The defendant wished before the case proceeded any farther, to call a witness who heard the conversation with Mr. Ellery, at his office, in order to show more particularly to the court and jury, why he refused to publish the apology. He called

Cornelius Coolidge, who, being sworn, testified substantially to the conversation at defendant's office, as stated by Mr. Ellery.

*Question by Defendant.* Was it not stated by me, to Mr. Ellery, that I was unacquainted with the Russian consul, had never spoken to him, that I indulged no personal animosity, and was perfectly ready to meet him on amicable terms ?

Answered affirmatively.

*Question by Defendant.* Did not Mr. Ellery appear to be satisfied that there was no malice on my part, and that I was willing to make any arrangement for the settlement of the difficulty that could be made without exposing me to the charge of inconsistency and duplicity ?

*Answer.* I do not recollect distinctly, but my impression is that you discovered a wish to have all differences adjusted.

*Defendant.* Mr. Ellery stated to me, in your presence, Mr. Coolidge, that the consul had some cause to regret what

BOSTON,
March, 1824.

Com'wealth.
v.
Buckingham.

had taken place; he was satisfied that I did not indulge any malicious or ungentlemanly feelings towards him, and that I had been deceived by correspondents; he was even sorry that the jury had convicted me on any part of the indictment which had just been tried; he was willing to use all his influence with the court to prevent the sentence from extending farther than to a fine merely nominal, if I would publish the apology. In reply, I said to Mr. Ellery that I thought it best to let the matter rest till the sentence of the court should be known; that if, in consequence of his interference with the judge and county attorney, the sentence should be merely nominal, I should think myself bound to say so, and to say every thing else, that could be said with justice in his favour; but that I thought this a bargain for payment in advance, for what it was by no means certain the consul could accomplish; for he could have no control over the sentence of the court. I appeal to you, Mr. Coolidge, if this be not the fact.

Mr. Coolidge could not recollect, *positively*, but he believed it to be substantially true.

The defendant was then about to call witnesses to testify as to what occurred at Concert Hall, at the exhibition alluded to.

The counsel for the Commonwealth objected.

Hon. *B. Gorham*, senior counsel for the defendant, replied to the arguments of the county attorney. He did not wish to introduce the testimony as a justification. He agreed with him that the law, as it now stands, does not allow the defendant to prove the truth of the charges as a justification. But he wished to introduce this testimony to repel the charge of malice, and then leave it to the jury to decide whether it were a justification or not. Mr. Gorham stated that he considered the principles of the law, which he supported with a variety of illustrations, all tending to show that the right of the defendant for which he now contended had been recognized in a great number of decisions, both in England and America. The law thus settled enabled the jury to judge of the law as well as the fact. But how could the jury be judges of facts,

when all facts were excluded from the trial? as they would be in this case, if the defendant were not permitted to show that there was a disturbance, and that the Russian consul took a part in it.

BOSTON,
March, 1824.

Com'wealth
v.
Buckingham.

*The opinion of the judge on the motion of the defendant's counsel to give in evidence the circumstances which occurred at Concert Hall.\**

" The defendant offers to prove that the publication in this case was for a justifiable purpose, and not a malicious attempt to defame, by showing the circumstances which occurred at the time. Had the attorney for the common-wealth instituted an inquiry, as to the deportment of the Russian consul at the exhibition alluded to, which under the averments in the indictment might have been done, I should have felt bound to let in all the testimony to this point, which either party could have brought forward. But no evidence of this kind has been offered on the part of the government. Nor is it material to the issue to be tried, what the deportment of that gentleman was upon that occasion, it being a just and legal presumption, that he did behave at the time with propriety, and according to his rank and station.

" The learned counsel for the defendant do not offer the evidence of the occurrences of the evening as a *justifica-tion* of the libel, because they admit that, by the law of this Commonwealth, ' the truth of the libellous words is no justification in a criminal prosecution for a libel.' — But they contend, that this evidence ought to be received, to rebut the presumption of malice. But if this evidence should be received in this case, I think it would go very far to evade the general rule, ' that a defendant cannot justify himself for publishing a libel, merely by

* This learned and valuable decision upon the admissibility of truth in evidence on indictment for libels, and the charge to the jury, were forwarded to me by his Honor Judge Thacher, at my request. I am certainly much gratified to acknowledge it.

BOSTON,
March, 1824.

Com'wealth
v.
Buckingham.

.proving the truth of the publication : ' for, under whatever circumstances it is received, the *use* which he would make of such evidence to the jury would be, to justify the publication.

"Before a defendant can be admitted to this evidence, he must prove " that the publication was for a justifiable purpose, and not malicious, nor with intent to defame any man." (*Clapp's Case*, 4 Mass. R. 163.) If a piece complained of appears to be a friendly admonition from a father to his son on his supposed misconduct; or the testimony of a witness given in a court of justice ; or a character given of a servant ; the purpose. thus appearing to be justifiable, and not malicious, the party would be entitled to prove the truth of the matter in justification. Or it may be apparent, *that the public has an interest in the publication*, on account of the *individual* concerned, or of the *subject matter*. The individual may be a public officer, or a candidate for a public office, and the piece may relate to the public service. It may be a petition or remonstrance to the government, complaining of some stretch of authority, or of some illegal act, in some one of its branches, as in the famous petition of the Seven Bishops to James II. remonstrating against his proclamation, granting unlimited toleration, and suspending all laws relative to tests, papists and others. (12 State Trials, Howell's ed. Trial of the Seven Bishops, 183.) It may relate to one who has been convicted in the due course of public justice of an infamous crime ; in which case, society should be put on its guard against his future machinations. Or it may relate to one charged with an infamous crime, as murder, burglary, or swindling for instance, and who may have fled from justice. The public may in such case be properly called on, by advertisement or otherwise, to assist in arresting the fugi-

tive, it being for the good of society that offenders should not escape punishment. In such, and in all similar cases, where a good intent appears on the face of the publication, evidence of the truth of the fact is admissible, to rebut the charge of malice.

"The decision of the present motion must depend on the question, whether the public appears to have such an interest in this case as to warrant the inquiry.

"The subject of the piece is 'an unpleasant and disgraceful disturbance,' as it is called, which occurred at an exhibition ball given at Concert Hall in this city. If it was of a public nature, and the community had an interest in it, it was because of *the occasion,* or *of the place.* The occasion was a voluntary assemblage of persons for the amusement of dancing; the place was a licensed inn. Now I would ask, what interest had the public in the details of this scene? If any crime was committed there, it may be investigated like other crimes, committed in any other place. Suppose that an individual had intruded himself improperly into the company, or had forfeited his right to continue there by any improper conduct: The managers, after requesting him to retire, and after his refusal, might have turned him out by force, leaving it to him, if he considered himself injured, to bring his action for redress. If there was any disorder, which was not the subject of legal redress or inquiry; if any one, for example, acted in a manner unbecoming his character as a gentleman, or his rank and standing in society; let such individual suffer the natural consequence of his conduct in the silent loss of reputation. But I do not know that the public had such an interest in it as that it called for, or would justify, a libellous piece in a newspaper.

BOSTON,
March. 1824.

Com'wealth
v.
Buckingham.

" If we should now institute an inquiry into all the circumstances which occurred at this ball, one manifest inconvenience would arise.    There were present between two and three hundred persons, ladies, gentlemen, and children.    We cannot limit our inquiry to what was said and done by Mr. Eustaphieve.  It will be equally proper and necessary to inquire, what was said and done by each indivinual who was present.   Because the scene consists of all that was said and of all that was done by each at the time.    Now, it is said in the piece, that there was a *disgraceful disturbance*, the history of which *would not do honor to the parties concerned.*   Who is to be disgraced is wholly uncertain.    But it is apparent, that the conduct of two hundred individuals, who are not on trial, who are not present, who have no notice of the question, and whose reputation may be affected by the inquiry, would, in this way, and without any legal necessity, be made a subject of solemn investigation in a court of justice.   I am of opinion, that such inquiry would shock the good sense even of persons not learned in the law ; much more would it offend the legal discernment of all, who are acquainted with its humane and wise principles.

" 'I take it to be clear law,' says Bayley, J. in the trial of Sir Francis Burdett, (4 Barn. and Alderson, 324.) ' that if a libel contain  matters imputing to another a crime capable of being proved'—(and I think the rule equally extends to a libel imputing to another disgraceful conduct)—'you are not at liberty at the time of the trial to give evidence of the truth of those imputations. And this is founded on a wise, wholesome, and merciful rule of law; for if a party has committed such an offence, he ought to be brought to trial fairly. and with-

out any prejudice previously raised in the minds of the public and the jury. The proper course, therefore, is to institute direct proceedings against him, and not to try the truth of his guilt or innocence behind his back, in a collateral issue to which he is no party.

"The indictment against Sir Francis Burdett was for a seditious libel, in which he was charged with attemp·ing to excite discontent among the subjects and soldiers of the King, and to inspire in. them hatred of the government. In the libel, he represented, that divers subjects of the king, men and women, had been inhumanly cut ·down by the dragoons at Manchester. The defendant offered, at the trial, to prove the truth of the allegation, or, in other words, the circumstances which occurred at the time. But the evidence was rejected ; and the judges of the King's Bench, although they differed on other points of law, which had been decided at the trial, yet they unanimously approved the rejection of this evidence. And even after the conviction of that defendant, when brought up to receive judgment, affidavits offered in mitigation of the sentence, containing proof of the facts charged in the piece, were refused by the whole court; because they said, if affidavits are admitted on one side, they must be admitted also on the other, and so the court would incidentally try individuals for a crime who were not on trial.

"This decision applies, in principle, to the present question. If we should go into this investigation, we should, in reality, be trying individuals for *disgraceful conduct*, when those individuals are not on trial. And as nothing is more clear to my mind, than that the character of an individual may not be attacked except in a court of jus-

BOSTON,
March, 1824.

Com'wealth.
v.
Buckingham.

tice, after due notice, and a fair opportunity to defend himself; and as the public has no interest in the inquiry, the evidence which is now offered on the part of the de-. fendant is rejected."

Mr. Gorham, in closing the case on the part of the defendant, very briefly commented on the course which had been pursued by the prosecutor, and the unprofitableness of contending when the testimony necessary for a defence was excluded. In prosecutions for libels it was necessary to charge the defendant with malice, in order to constitute a crime. How was he to meet this charge, unless he could be permitted to go so far into the facts, as to show that the publication was an account of actual occurences, and then let the jury judge whether there were malice in it? If his intention was merely to give, in the ordinary course of his profession as an editor, the substance of a quarrel which happened at a public tavern, his motive was not malicious; and there was no way of showing to the jury that it was not malicious, but by showing them that his publication was what it purported to be. If the publication, on which the indictment was founded, were a libel, then it is almost impossible to look into a newspaper without finding a libel. It is libellous to state that a quarrel took place between two persons in the street, because it is derogatory to the character of gentlemen to be concerned in quarrels. Governor Brooks, who issued a proclamation, offering a reward for the apprehension of Michael Powers, suspected of the murder of Kennedy, and all the printers who published that proclamation were guilty of libels; and if Powers could have applied to a grand jury, before his apprehension, and entered a complaint they would have been bound to find a bill of indictment, and the

jury would have been bound to find them guilty, if they were not permitted to produce facts to show the motive for the proclamation; and they could not be permitted to do so, under the doctrine now set up by the court. He mentioned several other supposed and real cases to illustrate the position, that it was impossible for any defendant to get clear of an indictment, without going into the facts of the case—not to justify the publication, but to show the intent, and to repel the charge of malice, which is a necessary ingredient in a libel. He thought, however, in this case, that the publication itself indicated no malice on the part of the defendant. The paper, and the conversation which had been related as having taken place at the defendant's office, were all he had to submit to the jury, and he wished them to recollect the testimony of Mr. Ellery and Mr. Coolidge, which exonerated him completely from the charge of malice. It must appear evident, that the prosecution would never have been renewed had the defendant published an apology, which he could not conscientiously publish. If there were any malice or vindictiveness exhibited, it was not by the defendant. He confidently expected a verdict of acquittal.

Mr. Austin closed on the part of the prosecution. He remarked, that it was difficult for a public prosecutor to pursue a course that should, at the same time, satisfy all the parties concerned. Those who came with their complaints were very much disposed to think he did not do enough: and those, whom, as an officer of the government, it was his duty to prosecute, very naturally thought he did too much. He should, therefore, without being influenced by either of these parties, endeavour to please a third—he should endeavour to please himself. He

BOSTON,
March, 1824.

Com'wealth
v.
Buckingham.

should follow the course, which the law, according to his understanding and best judgment, pointed out. In the course of his argument he remarked, that the term malice, as used in the indictment, did not signify ill will, or a deliberate intention to do an injury; but that the libel was published knowingly—that the defendant knew of the publication, and issued it of his own free-will, without compulsion. As to the apology which had been spoken of, Mr. Austin would not say that it was just such a one as he would have advised the defendant to publish; and he submitted to the jury whether the substitute which was offered, according to the account given of it by the witnesses, was such as an honorable man would accept.

### CHARGE TO THE JURY.

You perceive, gentlemen, that this is a charge against the defendant, for publishing a malicious libel on the character and conduct of Alexis Eustaphieve, a consul of his Imperial Russian Majesty, duly accredited, and residing in this city. The intent alleged is, that it was with design to injure and vilify him as well in his office, as in his general good name and estimation, and to have it believed, that he had, upon a certain occasion, conducted himself in a disgraceful manner.

The indictment contains a second count, in which the same piece is charged to have been published by the defendant, with the design, that it should be believed, that the Russian consul had conducted, upon a certain occasion, in a manner unworthy of his office and station of consul, by engaging in brawls and quarrels with persons of low character, and that it should be believed, that he was unworthy to hold and sustain that office and station.

If the piece complained of should not in your estima-tion be a libel; if the defendant did not publish it; or if it does not relate to the Russian consul, the defendant must be acquitted: and although you should be satisfied of these several facts, yet, as the essence of the crime con-sists in malice, if you should find that the act of the de-fendant was free from this quality, he must be acquit-ted.

But it is not necessary that you should be satisfied that the piece was published with all the evil motives which are alleged in the indictment. If you should be-lieve that the libel was designed to vilify the Russian consul as an individual only, and to bring him into con-tempt and hatred, you will find a verdict against the de-fendant on the first count only. But if you should be-lieve that it was published with the malicious design to injure the Russian consul in his office also, and to cause it to be believed that he was unworthy to retain it, then it will be your duty to find a general verdict. And if, after a full review of the case, the guilt of the defendant should remain doubtful, that doubt is to operate in favour of his innocence; and you are to weigh his conduct in the judg-ment of charity, by that golden rule, which we should wish, in like circumstances, should be applied to our own actions.

The fact of publication is admitted by the defendant; and in an interview with Mr. Ellery, he confessed that the piece was intended to apply to the Russian con-sul.

"The technical definition of the crime of libel is, that it is an excitement to a breach of the peace by means of a written instrument containing matter injurious to the fame and character of another." (4 Barn. and

BOSTON, March, 1824.

Com'wealth
v.
Buckingham.

Alderson, 112.)   This definition is well enough, and will guide you in forming your verdict.   The piece begins with paying a compliment to the performances of the pupils and to the ability of their instructors.   It proceeds to speak of a communication, which the editor had received, giving the details of " an unpleasant and disgraceful disturbance," which occurred in the course of the evening, " the history of which would not do honour to the parties concerned."   So that the writer was upon a subject of delicacy, affecting the character of other persons. Mr. Eustaphieve is then introduced under the description of the " Rugged Russian Bear," as being " a conspicuous actor in the farce, which had well-nigh turned out to be a tragi-comedy, in consequence of his attempting to jump, with his cocked hat and all, down the throat of one of his opponents." He then agrees with his correspondent, that it was best to give no opinion on the merits of the controversy, but to leave it to the decision of him " who, while acting as the representative of the greatest monarch in the world, the magnanimous Alexander, the autocrat of all the Russias, &c. does not deem it a derogation from the dignity of his high vocation, to become a party in the quarrels of dancing masters and fiddlers :" thus bringing the details of this scene into direct connexion with the office which he held, and asserting, that though Mr. Eustaphieve was the representative of the Emperor Alexander, he did yet condescend to engage in the quarrels of dancing masters and fiddlers.

Whether this piece has the tendency to degrade the Russian consul in public estimation as a man, and to affect his standing in his office, it is for you, gentlemen, to judge.   Consuls are persons appointed by the sovereign of a state, to reside in foreign ports, for the purpose of taking care of the commercial interests of his subjects, transacting business there.   They are usually persons of

known probity and commercial intelligence, and are required to understand not only the laws and rights of their own country, but the laws and customs of the place where they are to reside. ˙ It is their duty to aid and protect their fellow subjects, and to advise and assist them in all cases, wherein their right or interest may be concerned.    The affairs of trade, and the interests, rights, and privileges of merchants and seamen in foreign countries, are ordinarily left to the conduct of their consuls.   It is expected of them, that they correspond with the ambassador from their respective sovereigns to the government of the country within which they are stationed, and that they should send to him information of any transactions, which may affect the political or commercial interests of their own country.    And in case no ambassador or other public minister from their sovereign should reside at the time in the country, they are to transmit their letters directly home to their government.    Though a consul be a public minister under the protection of the law of nations, he yet enjoys some important privileges annexed to his office, which distinguish him from the private inhabitants of the place where he resides.    So that you perceive that, from their situation, consuls are officers of honour and trust; that it is in their power to do much good or harm ; and even to affect the relations of friendly countries : and hence arises the importance, that they should be honourable men, and that they should support the dignity of their station, by their grave and prudent deportment.

Now consider whether, to represent an individual who holds an office of this kind as guilty of disgraceful conduct, and engaging in the quarrels of dancing masters and fiddlers, is not injurious to his fame and character.

In common with all other citizens, Mr. Eustaphieve is entitled to be protected from unlawful attempts to render him an object of odium or contempt. In rendering him such, you will consider, whether his official character will not be sacrificed. It is not to be supposed that his government will retain an officer in a station of confidence and responsibility, if he should not maintain a character becoming that station. So that it is not foreign to your duty to inquire, whether the piece complained of has that tendency; and if it has, whether it will not also tend to provoke him and his friends to acts of revenge, and so to a breach of the peace, which is the definition of the offence.

Here you will recollect the construction which the counsel for the defendant have put on this piece. They say, with truth it contains no charge of official misconduct, nor any imputation on the moral character of the Rusian consul. They also say, it is harmless, sportive wit, which a wise man would disregard; and they insist, that no good comes from prosecutions of this description. They call upon you, farther, to give to the words the most favourable sense, and it is your duty to do so; but you are not to violate your understanding, by giving to the words any signification which is not consistent with sound sense and the common meaning of the language.

You will next inquire, if the intent of the defendant in publishing this piece was malicious; and if you find that it was done deliberately and wilfully, and that he neglected a favourable opportunity to redress the injury, it will be evidence of malice. To this point, the testimony of Mr. Ellery is material. He testifies, that some time in January last, he, as a friend of the Russian consul, called on the defendant, and informed him that this

piece had greatly wounded the feelings of that gentle-man, and that he was apprehensive, it would tend to in-jure him with his government. To this the defendant replied, that he bore no ill will to the Russian consul, and had no acquaintance with him ; that he had no knowledge of the circumstances of the transaction, but that he had written the piece in consequence of a com-munication, which had been sent to him on the subject. Mr. Ellery then proposed to the defendant, to publish an apology, that the redress might be as public as the inju-ry. The defendant declined publishing one which Mr. Ellery had written, and wrote one himself, which he was willing to publish. The substance of this was, that as many respectable persons had declared there was nothing improper in the conduct of the consul, and others equally respectable maintained the contrary, it was not for him to decide the matter. For my part, I regret that this negotiation was not more successful; and I think it is to be lamented, that when the defendant wrote this piece, it had not occurred to his prudence, that, possibly he was about to inflict a severe wound in the breast of a man, who, he says, had never injured him, and against whom, he declares, neither at that time, nor at any other, had he entertained any malice.

Gentlemen, with the scene at Concert Hall you have no concern at this time. If any riot was committed there, let those who were engaged in it be presented ac-cording to law. If the Russian consul committed any offence against the laws, or against good manners, he is liable to legal animadversion, and he will derive no pro-tection from his official station. But let it not be under-stood, that the printer of a newspaper may publish a piece, calculated to bring that gentleman into contempt

BOSTON,
March, 1824.

Com'wealth
v.
Buckingham.

with us and to destroy him with his own government, without trial, and without opportunity to be heard in his own defence.

We do not hold our characters in this Commonwealth at the mercy of the printers of any newspaper. A citizen may not be charged with any disgraceful or flagitious conduct, affecting his good name, his standing in society, or his employment, except before the judicial tribunals of the country, where he may be heard in his defence, and tried according to the established rules of law.

That the law of libel is ancient, and dates from a period beyond that of newspapers, is no reason, in my opinion, for relaxing its principles. The printer of a newspaper has power in proportion to his talents, to the interest which he excites, and to the diffusion of his publication. Who is the perfect man that may not by the eloquent and ingenious satirist be placed in an uncomfortable situation? What is there, of all that is sacred and venerable, that has not been exposed to the shafts of ridicule? And if, whenever we open a newspaper, we are to expect to find some extravagant representation of ourselves, or of our neighbours, something caricatured either of praise or blame; who that is conscious of the defects, which are incident to the human character, would wish to live in such a society.

While all protection and encouragement are to be given to the directors of the press, in diffusing intelligence, in imparting instruction, and in the free discussion of all truths affecting religion, morals, government, and whatever concerns human happiness; there is a limit beyond which, if they pass, it must be known that they violate the law. Whether this is one of those cases, is left to your judgment to decide.

The jury brought in a verdict of guilty on the first count, and not guilty on the second. At the request of the defendant, the court then pronounced sentence, which was, that he should *be imprisoned thirty days in the common jail, and pay the costs of prosecution.*